1

2

3

4 **UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
5 **RENO, NEVADA**

6

7

BULLION MONARCH MINING, INC., a    )        3:09-cv-00612-ECR-VPC
8 Utah corporation,                 )
                                    )
9      Plaintiff,                   )        **Order**
                                    )
10 vs.                              )
                                    )
11 BARRICK GOLDSTRIKE MINES, INC.   )
and DOES I-X, inclusive,           )
12                                  )
       Defendant.                  )
13                                  )
_____)

14

15      This diversity case arises out of a dispute regarding royalty

16 payments on production from certain mining claims.  Now pending are a

17 number of motions for summary judgment or partial summary judgment,

18 including two (## 43, 50) filed by Defendant Barrick Goldstrike

19 Mines, Inc. ("Barrick") and one (#53) filed by Plaintiff Bullion

20 Monarch Mining, Inc. ("Bullion").  The motions are ripe, and we now

21 rule on them.

22

23                    **I. Factual Background**

24      The dispute underlying this case relates to an agreement dated

25 May 10, 1979, regarding certain mining claims in Eureka County,

26 Nevada ("the 1979 agreement").  (1979 agreement, Ex. 1 (#18-1).)

27 Bullion asserts that under the 1979 agreement, Barrick is liable to

28 Bullion for payment of royalties on production from those claims.

Barrick was not one of the original parties to the agreement: rather, Bullion argues that Barrick became bound by the terms of the 1979 agreement in July 1990, when Barrick's predecessor, High Desert Mineral Resources of Nevada, Inc. ("High Desert") purchased the Subject Property.[1]  Barrick disagrees that it is bound by the terms of the 1979 agreement.

The 1979 agreement sets out the respective rights and obligations of the parties to it with regard to properties described in two exhibits attached to the agreement.  First, "Exhibit A-1" lists "unpatented and patented mining claims" constituting the "Subject Property."  (Id. at 22.)  Second, "Exhibit A-2" describes an "Area of Interest," which is a geographical area that includes the Subject Property, as well as a larger surrounding area.  (Id. at 21.) Under the terms of paragraph 4 of the 1979 agreement, Bullion is to receive a royalty based on production from mining activity on the Subject Property.  (Id. at 6-7.)  In addition, paragraph 11 ("the AOI Provision") of the 1979 agreement provides that if any mining interests are later obtained within the Area of Interest described in Exhibit A-2, those new acquisitions are "subject to the royalty interest of BULLION."  (Id. at 12.)  Paragraph 17 of the 1979 agreement further provides that its terms "shall inure to the benefit

---

[1] The original parties to the 1979 agreement were "Bullion Monarch Company, a Utah corporation" ("Old Bullion"); "Polar Resources Co., a Nevada corporation"; "Universal Gas (Montana), Inc., a Montana corporation"; "Universal Explorations, Ltd., a Canadian corporation"; "Camsell River Investments, Ltd., a Canadian corporation"; "Lambert Management Ltd., a Canadian corporation"; and "Eltel Holdings Ltd., a Canadian corporation."  (Second Am. Compl. Ex. 1 at 2 (#18).)

of, and be binding upon, the successors and assigns of the parties hereto." (Id. at 15.)

Paragraph 1 of the 1979 agreement provides that it shall be the sole and only agreement governing the ownership, operations, and payment from the Subject Property, cancelling, revoking, and terminating any and all other agreements, except any specifically preserved by the terms thereof. (Id. at 4.) Paragraph 3 provides that a March 14, 1979 agreement between Polar and Universal ("Polar-Universal agreement") is incorporated by reference, and that all of the parties agree to the terms of the Polar-Universal agreement "allowing UNIVERSAL the sole and only control over further development and production from the Subject Property . . . ." (Id. at 6.) The Polar-Universal agreement provides that "the right of any party hereto to acquire any interest in the joint lands from any other party hereto shall not extend beyond twenty-one (21) years after the lifetime of the last survivor of the lawful descendants now living of Her Majesty Queen Elizabeth II." (Polar-Universal agreement, Exhibit 1A, at 35 (#51-2).)

Paragraph 13 of the 1979 agreement provides that the term of the 1979 agreement is for a period of ninety-nine (99) years, commencing on May 10, 1979. (1979 agreement, Ex. 1, at 13 (#18-1).) The 1979 agreement further provides that "[s]hould the terms of any agreement . . . preserved by specific reference herein be in conflict with this Agreement, the terms of this Agreement shall control." (Id. at 4.)

Barrick's predecessor, High Desert, purchased the Subject Property in 1990, by exercising an option under an Option Agreement entered into with the Bullion-Monarch Joint Venture, successors-in-

3

interest to the original parties to the 1979 agreement. (Bullion-Monarch Joint Venture-High Desert Option Agreement ("BMJV-HD Option Agreement"), Mot. for Summary Judgment Based on a Lack of Obligation, Exhibit 17 (#52-8).) The BMJV-HD Option Agreement provided that Barrick "shall . . . assume and become liable for the . . . obligations and liabilities of [the Bullion-Monarch Joint Venture] . . . under the [1979 agreement]." (Id. ¶ 7.3B.) Barrick also paid $9.5 million in cash and a royalty on production to the Bullion-Monarch Joint Venture in exchange for the properties. (Id.)

Barrick disputes that it is bound by the 1979 agreement, including paragraph 11, which extends the requirement to pay royalties from the properties specifically listed in Exhibit A-1 to properties later obtained within the Area of Interest described in Exhibit A-2. (Answer (#20).) The parties also disagree as to which of Barrick's properties within the Area of Interest might constitute later-acquired properties that could be subject to Bullion's royalty interest, even assuming that Barrick is bound by paragraph 11 of the 1979 agreement.

The 1979 agreement has previously been the subject of litigation between the parties. On May 18, 1993, Bullion filed suit in Nevada state court against Newmont, High Desert (Barrick's predecessor), and others, asserting rights under paragraph 7 of the 1979 agreement. This provision allowed Bullion to take title to the Exhibit A-1 properties — but not additional properties later added to the Subject Property pursuant to paragraph 11 — in case of default on the royalty payment obligations. Bullion pleaded the 1993 lawsuit as a quiet title action, seeking to establish legal title to the Exhibit A-1

4

properties.  (1993 Compl., Mot. for Summary Judgment Based on a Lack
of Obligation, Ex. 29 (#52-22).)  Newmont and High Desert
counterclaimed, asserting quiet title claims of their own with regard
to certain properties.  (1993 Answer & Countercls., Mot. for Summary
Judgment Based on a Lack of Obligation, Ex. 30 (#52-23).)

    Bullion failed to respond to the counterclaim, and the Nevada
state court entered a Judgment by Default against Bullion.  (Mot. for
Summary Judgment Based on a Lack of Obligation, Ex. 31 (#52-24).)
The Judgment by Default states in part that Bullion has "no right,
title, estate, lien or interest in or to any of the mining claims and
properties described on Schedule "1" hereto (the 'Properties') . . .
."  (Id. ¶ 1.)  The Judgment by Default also provides, however, that
Bullion's right to a production royalty under paragraph 4 of the 1979
agreement "shall survive this Judgment," and that Bullion "shall not
be precluded by this order from asserting its right to the said
production royalty."  (Id. ¶¶ 1, 3.)


## II. Procedural Background

    On April 28, 2008, Bullion filed suit against Newmont and
Barrick.  (See Compl. (#1), 3:08-cv-00227-ECR-VPC).  Bullion's claims
against Barrick, however, were severed on the stipulation of the
parties, approved by the Court, and are proceeding in the present
lawsuit separate from the original lawsuit filed against Newmont and
Barrick.  (See Order (#118), 3:08-cv-00227-ECR-VPC.)  In the Second
Amended Complaint (#18), Bullion asserts five claims for relief.  The
first, for declaratory judgment, seeks a ruling that Bullion is
entitled to "a royalty and/or compensation for mining activities and

production from within the Area of Interest." (Second Am. Compl. ¶ 15 (#18).)  The second, for breach of contract, alleges that Barrick has breached its obligations under the 1979 agreement to pay Bullion such royalties. (Id. ¶¶ 16-20.)  The third asserts that Barrick breached the covenant of good faith and fair dealing that was a part of the 1979 agreement. (Id. ¶¶ 21-25.)  The fourth is for unjust enrichment, claiming Barrick and its predecessors in interest have been unjustly enriched at Bullion's expense. (Id. ¶¶ 26-33.) Finally, Bullion asserts a right to an accounting of all royalties owed to Bullion for Barrick's mining activities in the Area of Interest. (Id. ¶¶ 34-38.)  Barrick has denied Bullion's claims. (See Answer (#20).)

In the related case against Newmont, we denied Newmont's motion for judgment on the pleadings (Mot. for Judgment on the Pleadings (#11), 3:08-cv-00227-ECR-VPC) in which Newmont argued that all of Bullion's claims were barred by the claim preclusive effect of the 1993 judgment. (See Order (#33), 3:08-cv-00227-ECR-VPC.)  We ruled that the 1993 state court judgment did not bar any of the claims in the related case against Newmont because the judgment only barred Bullion from asserting royalties that accrued before May 18, 1993, the date Bullion filed its state court complaint.  Neither party disputes that the same rationale applies in this case.

On August 6, 2010, Barrick filed a motion for summary judgment entitled "Motion for Summary Judgment on All Claims Pursuant to the Rule Against Perpetuities" (#43).  Bullion opposed (#58) the motion (#43), and Barrick replied (## 77, 104 (superseding the original reply filed as #77)).  On August 13, 2010, Barrick filed a second

6

motion for summary judgment entitled "Motion for Summary Judgment Based on a Lack of Obligation Under the 1979 Agreement" ("MSJ for Lack of Obligation") (#50).  Bullion opposed (##67, 105 (superseding the original opposition filed as #67)) and Barrick replied (#88).

Bullion filed its own motion for partial summary judgment (#53) on August 13, 2010.  This motion has since been amended by stipulation (#71).

On September 24, 2010, Barrick filed a "Motion for Protective Order Relating to Documents Inadvertently Disclosed by Newmont USA Limited" ("Motion for Protective Order") (#89).  The Motion for Protective Order (#89) explained that Barrick "asserted privilege claims with respect to certain documents . . .  which had been included as exhibits to and discussed in 'Bullion Monarch Mining Inc.'s Opposition'" (#67) to Barrick's MSJ for Lack of Obligation (#50).  On November 16, 2010, Magistrate Judge Cooke entered an order (#100) granting in part and denying in part Barrick's Motion for Protective Order (#89).  The order (#100) required, *inter alia*, that Bullion identify protected documents, and to file a notice with the Clerk to strike all identified protected documents from the record. On November 22, 2010, Bullion filed a notice (#102) withdrawing Exhibits 9 and 16 of the document entitled "Clayton P. Brust Affidavit in Support of Opposition to Barrick Goldstrike Mines, Inc.'s Motion for Summary Judgment Based on a Lack of Obligation Under the 1979 Agreement" (#68), and requesting that all those exhibits be stricken from the record.  On December 9, 2010, we granted (#108) a stipulated amended briefing schedule allowing Bullion to file an amended opposition to Barrick's MSJ for Lack of

7

Obligation, and Barrick to file an amended reply in support of its
MSJ for Lack of Obligation.  Further, Bullion was permitted to file a
supplement to its amended opposition to Barrick's MSJ for Lack of
Obligation, and Barrick was permitted to file a supplemental reply to
its amended reply in support of its MSJ for Lack of Obligation.

Bullion filed its amended opposition (#105) to Barrick's MSJ for
Lack of Obligation (#50), and Barrick filed its amended reply (#104)
in support of its MSJ for Lack of Obligation (#50).  Bullion also
filed its supplemental response (#109) and Barrick filed its
supplemental reply (#113).

## III. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where
no material factual dispute exists.  N.W. Motorcycle Ass'n v. U.S.
Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994).  The court must
view the evidence and the inferences arising therefrom in the light
most favorable to the nonmoving party, Bagdadi v. Nazar, 84 F.3d
1194, 1197 (9th Cir. 1996), and should award summary judgment where
no genuine issues of material fact remain in dispute and the moving
party is entitled to judgment as a matter of law.  FED. R. CIV. P.
56(c).  Judgment as a matter of law is appropriate where there is no
legally sufficient evidentiary basis for a reasonable jury to find
for the nonmoving party.  FED. R. CIV. P. 50(a).  Where reasonable
minds could differ on the material facts at issue, however, summary
judgment should not be granted.  Warren v. City of Carlsbad, 58 F.3d
439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct. 1261 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although the parties may submit evidence in an inadmissible form — namely, depositions, admissions, interrogatory answers, and affidavits — only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  FED. R. CIV. P. 56(c); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof.  Anderson, 477 U.S. at 248.  Summary judgment is not proper if material factual issues exist for trial.  B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999).  "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  Disputes over irrelevant or unnecessary facts should not be considered.  Id.  Where there is a complete failure of proof on an

9

essential element of the nonmoving party's case, all other facts
become immaterial, and the moving party is entitled to judgment as a
matter of law.  Celotex, 477 U.S. at 323.  Summary judgment is not a
disfavored procedural shortcut, but rather an integral part of the
federal rules as a whole.  Id.

### IV. Barrick's Motion for Summary Judgment Pursuant to the Rule Against Perpetuities (#43)

Barrick argues that Bullion's claims are barred by common law
rule against perpetuities because under the AOI Provision, a party
could be required to pay royalties on property acquired at any time
during a ninety-nine year period.

**A. Common Law Rule Against Perpetuities**

The Nevada Constitution declares that "[n]o perpetuities shall
be allowed except for eleemosynary purposes."  Nev. Const. Art. 15, §
4.  When the 1979 Agreement was executed, Nevada applied the common
law rule against perpetuities.  The common law rule against
perpetuities provides that "[n]o interest is good unless it must
vest, if at all, not later than twenty-one years after some life in
being at the creation of the interest."  Sarrazin v. First Nat. Bank
of Nevada, 111 P.2d 49, 51 (Nev. 1941) (quoting Gray, The Rule
against Perpetuities, 3d Ed., p. 174, § 201).  Nevada has since
adopted a statutory rule against perpetuities.  NEV. REV. STAT. §
111.1031-1039.  The statute excludes, with a few exceptions, any
nonvested property interests arising out of "nondonative
transfer[s]."  NEV. REV. STAT. § 111.1037.  Nevada's statutory rule
does not include any superseding clauses such as the one contained in

10

the Uniform Statutory Rule Against Perpetuities[2], and therefore, we proceed on the basis that commercial contracts, such as the 1979 Agreement at issue in this case, remain subject to the common law rule against perpetuities.

The common law rule against perpetuities is "not a rule of construction, but a positive mandate of law, to be obeyed irrespective of the question of intention." Melcher v. Camp, 435 P.2d 107, 111 (Okla. 1967); see also Brown Bros. Harriman Trust Co., N.A. v. Benson, 688 S.E.2d 752, 756 (N.C. Ct. App. 2010); Washington State Grange v. Brandt, 146 P.3d 1069, 1074 (Wash. Ct. App. 2006). If an interest violates the common law rule against perpetuities, the interest is void *ab initio*. See, e.g., Firebaugh v. Whitehead, 559 S.E.2d 611, 615-16 (Va. 2002).

Barrick argues that the AOI Provision in the 1979 agreement violates the common law rule against perpetuities and must be declared void *ab initio*. In order to find that the AOI Provision violates the rule against perpetuities, we must find that (a) the royalty interest claimed by Bullion in the AOI Provision was a nonvested interest, (b) the ninety-nine year contract period is greater than the applicable perpetuities period, and (c) Nevada's statutory rule against perpetuities does not apply.

///

///

///

---

[2] Compare, *e.g.*, section 21201 of the California Probate Code, which provides that "[t]his chapter supersedes the common law rule against perpetuities."

11

**A. The Royalty in the AOI Provision is a Nonvested Interest.**

There are two separate royalties allegedly due to Bullion, but only one is at issue in this case.[3]  Bullion's claims against Barrick are solely based on paragraph 11 of the 1979 Agreement, the AOI Provision.  There is no allegation that Barrick, or any other party, has failed to make royalty payments, due under paragraph 4, on the Subject Property.  That royalty interest undisputedly vested at the execution of the 1979 agreement when Universal acquired the Subject Property and took on the obligation to pay royalties to Old Bullion. The royalty interest due under the AOI Provision, however, did not vest at the time of execution, and could vest, or fail to vest, at any time during the ninety-nine year contract period.

Bullion disputes that the royalty interest under the AOI Provision is a nonvested interest.  Bullion first argues that because Old Bullion obtained the right of alienation over the royalty interest at the execution of the 1979 agreement, the royalty interest

---

[3] Bullion argues that the royalties due under Paragraph 4 and 11 are one and the same, and should not be considered separately.  Bullion points to language in Paragraph 11 providing that upon acquiring any property in the area of interest, Universal shall offer to include that property in the Subject Property if Polar-Camsell pays fifty percent of the purchase price.  However, the applicable section of Paragraph 11 seems to be the next section, which provides that upon rejection by Polar-Camsell, the newly-acquired property in the area of interest shall remain Universal's sole property and shall not become part of the Subject Property, subject only to the royalty interest of Bullion.  At this time, decades after the 1979 Agreement was executed, neither Universal nor Polar-Camsell are present in the case.  Nor is there any evidence that should Barrick be considered the new operator with Universal's duties and obligations, any third party then steps into the shoes of Polar-Camsell for purposes of Paragraph 11.  Therefore, we conclude that any property acquired by Barrick in the area of interest does not become part of the Subject Property, and the royalties due under Paragraph 11 are distinct from those due under Paragraph 4, which applies only to the Subject Property.

1  must necessarily have vested at that time.  Bullion cites no support

2  for this contention.  We agree with Barrick that "[t]he ability to

3  sell, transfer, or assign a future, contingent interest does not

4  transform that interest into a presently vested interest."  (D's

5  Reply at 4 (#77).)

6       Bullion's remaining arguments attempt to confuse the issue by

7  conflating the vested royalty under Paragraph 4 with the contingent

8  royalty under the AOI Provision.  Because Bullion is not seeking

9  payments under paragraph 4 of the 1979 agreement, that provision is

10 irrelevant to the question of whether the royalty interest due under

11 the AOI Provision vested in 1979.

12      Bullion cites an Alabama case in support of its argument that

13 the royalty interest at issue here vested in 1979.  The court in

14 Dauphin Island Prop. Owners Ass'n v. Callon Inst.'l Royalty Investors

15 was not, however, dealing with royalty interests in land that may or

16 may not be acquired by the grantor of the royalty at some point in

17 the future.  519 So.2d 948, 949 (Ala. 1988).  The Alabama Supreme

18 Court declined to follow the Kansas rule that all royalty interests

19 in minerals vest at the time of production, rather than conveyance.

20 Id. at 952.  This is not the question presented to us.

21      We examine, instead, whether a royalty interest granted in

22 property that the grantor presently does not own, and may or may not

23 ever acquire, vests at the time of execution, or at the time the

24 grantor acquires such property.  Other courts have decided that

25 nonvested royalty interests granted in property not owned by the

26 grantor violate the rule against perpetuities.  The Indiana Court of

27 Appeals held that "overriding or nonparticipating royalty interests

28                                    13

are real property interests which vest immediately in the royalty holder only to the extent that such interests are granted in property owned by the grantor at the time of conveyance, otherwise such royalty interests will not vest until acquisition by the grantor." _Wedel v. Am. Elec. Power Serv. Corp._, 681 N.E.2d 1122, 1137-38 (Ind. Ct. App. 1997);[4] _see also_ _Melcher_, 435 P.2d at 115 (case holding that one party's preemptive option in mineral properties, contingent for its activation on a different party acquiring the right to lease minerals in a certain area, violates the rule against perpetuities).

Bullion, or its predecessor, did not acquire the right to receive royalties from specific properties in the Area of Interest at the time the 1979 agreement was executed.  Instead, the royalty interest was contingent upon the parties acquiring, at some point in the future, any property in the Area of Interest.  That event could occur at any time during a ninety-nine year period, and would thereby bestow upon Bullion the right to collect royalties.  This is distinguishable from the case in which a party grants a royalty interest in property it currently owns, a situation that does not violate the rule against perpetuities in most states, and which is not in dispute here.[5]

---

[4] Overriding or nonparticipating royalty interests are royalty interests "in minerals located on property that the royalty holder (_i.e._, grantee) does not actually own."  _Wedel_, 681 N.E.2d at 1133.

[5] In Kansas, royalty interests do not vest at all until production, regardless of whether the grantor of the royalty owns or is otherwise leasing the right to produce minerals from the property. _See, e.g._, _Lathrop v. Eyestone_, 227 P.2d 136, 141 (Kan. 1951); _Rucker v. DeLay_, 235 P.3d 566, 575 (Kan. Ct. App. 2010).

**B. The Perpetuities Period is Twenty One Years.**

Bullion argues that the parties provided a measuring life for the 1979 agreement in the Polar-Universal agreement, which is incorporated by reference for a limited purpose in the 1979 agreement.  The 1979 agreement provided that it "shall be the sole and only agreement governing the ownership, operations and payment from the Subject Property, cancelling, revoking, rescinding and terminating any and all other deeds, conveyance, contracts or agreements between the parties hereto, or any combination thereof, affecting the Subject Property, except . . . any agreement, contract or deed specifically preserved by the terms hereof."  (1979 agreement ¶ 1.)  The 1979 agreement referenced the Polar-Universal Agreement, stating that it is "incorporated herein by reference, . . ., and that all of the parties hereto agree to the terms of said Agreement allowing UNIVERSAL the sole and only control over further development and production from the Subject Property."  (Id. ¶ 3.)  The Polar-Universal Agreement provided that "the right of any party hereto to acquire any interest in the joint lands from any other party hereto shall not extend beyond twenty-one (21) years after the lifetime of the last survivor of the lawful descendants now living of Her Majesty Queen Elizabeth II."

We disagree with Bullion that the provision in the Polar-Universal Agreement serves to determine the measuring life for the AOI Provision of the 1979 agreement.  It is not entirely clear whether the perpetuities term of the Polar-Universal Agreement should even be considered incorporated into the 1979 agreement, as the 1979 agreement provided that the parties agree to the terms of the Polar-

15

Universal Agreement that allow Universal control over further development and production from the Subject Property.  Even taking the inference in favor of Bullion that the entire Polar-Universal Agreement was incorporated into the 1979 agreement, the perpetuities provision, by its language, simply does not apply to the royalty interest under the AOI Provision.  The provision only applies to the right of the parties to that agreement, Polar and Universal, to acquire interest in the "joint lands."  The term "the lands" is defined in the Polar-Universal Agreement as "the lands contained in the mineral claims" and "the mineral claims" is defined as "the claims and leases set forth and described in Schedule 'A' attached to the agreement."  (Polar-Universal Agreement at 2.)  Schedule A identified only those mining claims that were later included in the definition of Subject Property under the 1979 agreement.  The perpetuities provision contained in the Polar-Universal agreement does not, without any enlargement of the original express language, then apply to the rights of the parties to the area of interest. Even were we to read the provision as applicable to the area of interest, the provision is, by its own terms, limited to any rights of acquisition, rather than being a broad catch-all clause intended to apply to all rights of the parties to the agreement, such as Bullion's royalty rights.  In short, the connection between the perpetuities clause of the Polar-Universal Agreement and the AOI Provision of the 1979 agreement is simply too attenuated, and therefore there is no measuring life specified in the 1979 agreement that applies to the AOI Provision.

1    We are required to take all reasonable inferences in Bullion's

2   favor in considering a motion for summary judgment.  Our conclusion

3   that the perpetuities term in the Polar-Universal Agreement is not

4   contrary to that requirement.  Nor would a conclusion that the

5   perpetuities term would, without express language to the contrary,

6   apply in this case necessitate a different result.  The 1979

7   agreement provides its own provision governing the term of the

8   agreement.  Paragraph 13 provides that "[t]he term of this agreement,

9   as it affects the continuing contractual relationships between the

10  parties hereto, is for a period  of NINETY-NINE (99) years . . . ."

11  Paragraph 1 provides that "[s]hould the terms of any agreement,

12  letter agreement or other document or understanding preserved by

13  specific reference herein be in conflict with this Agreement the

14  terms of this Agreement shall control."  Therefore, even if the

15  provision in the Polar-Universal agreement could be stretched to

16  apply to Bullion's royalty right, it is expressly superseded by the

17  ninety-nine year term provided in the 1979 Agreement.

18   When the parties to a transaction are corporations and no

19  measuring lives are specified in the agreements, the perpetuities

20  period is simply twenty-one years.  See Symphony Space, Inc. v.

21  Pergola Props., Inc., 669 N.E.2d 799, 806 (N.Y. 1996);

22  Stuart Kingston, Inc. v. Robinson, 596 A.2d 1378, 1383 (Del. 1991).

23  We find that Bullion's contention that the perpetuities period is

24  "the length of the life of any person alive at the time the 1979

25  agreement was entered plus 21 years" is contrary to law.  Measuring

26  lives "must not be so numerous or of such a description that it would

27  be impossible or exceedingly difficult to identify them . . . ."

28                                  17

1  _Bank of America, N.A. v. Carpenter_, 929 N.E.2d 570, 580 (Ill. App.

2  Ct. 2010).

3       The contractual period fixed by the 1979 agreement is ninety-

4  nine years, which greatly exceeds the applicable twenty-one year

5  perpetuities period.  The fact that the parties or their successors

6  may have acquired properties in the Area of Interest before the

7  twenty one year perpetuities period expired is immaterial.  According

8  to the terms of the 1979 agreement, the contingent event could occur

9  at any time, or not occur at any time, during the following ninety-

10 nine years, and therefore, the AOI Provision violates the common law

11 rule against perpetuities.

12       **C. The Statutory Reform Provisions are Inapplicable.**

13       Bullion argues that even if we find that the AOI Provision

14 violates the rule against perpetuities, we must reform the provision

15 rather than declare it void.  Bullion's argument rests on a provision

16 enacted in 1987 that provides: "with respect to a nonvested property

17 interest or a power of appointment that was created before July 1,

18 1987, and that violates the rule against perpetuities as that rule

19 existed before that date, a court, upon the petition of an interested

20 person, may exercise its equitable power to reform the disposition in

21 the manner that most closely approximates the transferor's manifested

22 plan of distribution and is within the limits of the rule against

23 perpetuities applicable when the nonvested property interest or power

24 of appointment was created."  Nev. Rev. Stat. § 111.1039.2.  This

25 provision is permissive rather than mandatory; it provides that a

26 court "may" reform, but not that a court "must" reform an agreement

27 that violates the rule against perpetuities.  Also, while the

28                                      18

provision does not expressly exclude nondonative transfers, Nevada's statutory rule against perpetuities is limited, with a few exceptions, to donative transfers only.  The language of the provision itself implies that it applies only to donative transfers. The term "transferor's manifested plan of distribution" is at odds with a reading that encompasses commercial transactions.  To read this retroactive reformation provision as applicable to nondonative transfers would result in commercial nonvested interests created before July 1, 1987 being subject to the statutory reformation provision, and commercial nonvested interests created after July 1, 1987, being outside of the statutory rule against perpetuities. Because Nevada did not include a superseding clause in its statutory rule against perpetuities, and thereby preserved the common law as it applies to nondonative transfers, we find that this statutory reformation provision does not apply to commercial transactions such as the 1979 agreement.

Under common law, the rule against perpetuities does not allow reformation of voided interests by the court.  Many states have enacted statutory rules against perpetuities to combat the often-harsh results of the common law rule against perpetuities, but Nevada's statute applies only to donative transfers, and therefore cannot save the AOI Provision, which is void *ab initio* under the common law rule against perpetuities.  See, e.g., Shaffer v. Reed, 437 So.2d 98, 99 (Ala. 1983) (recognizing that "the rule must seem awfully harsh" but that the court must follow it).

## V. Bullion's Remaining Claims

Bullion argues, as a last resort, that estoppel, unjust enrichment, and the covenant of good faith and fair dealing prevent Barrick from retaining any benefits received under the 1979 agreement while being relieved of its obligation to pay royalties under the AOI Provision.

### A. Estoppel

In considering Barrick's MSJ for Lack of Obligation (#50), and Bullion's motion for partial summary judgment (#53), we have examined the representations High Desert, Barrick's predecessor, made when acquiring the Subject Property, and do not agree that estoppel bars the rule against perpetuities.

In support of its estoppel claim, Bullion cites Pure Oil Co. of the Carolinas v. Baars et al., 31 S.E.2d 854 (N.C. 1944). In Pure Oil, the Supreme Court of North Carolina decided that when an option agreement given in consideration for property was voided under the rule against perpetuities, the property must also be returned. Id. at 856. The circumstances in our case are distinguishable. The 1979 agreement was made decades ago, between Old Bullion and parties not present here. Barrick's obligations arise under a different agreement, an option agreement between the Bullion-Monarch Joint Venture and High Desert. The option agreement provided that at closing, High Desert shall "assume and become liable for . . . all obligations of Optionor under the Underlying Agreements. . . ." (BMJV-HD Option Agreement ¶ 7.3B, MSJ for Lack of Obligation, Exhibit 17 (#52-8).) That is, Barrick's predecessor, High Desert, promised to assume all of the Bullion-Monarch Joint Venture's obligations in

20

1  return for its purchase of the Subject Property.[6]  Our conclusion

2  that the AOI Provision violates the rule against perpetuities voids

3  that provision as of 1979.  Therefore, the Bullion-Monarch Joint

4  Venture did not have any obligations to pay royalties in the area of

5  interest in 1990, when it executed the option agreement, and Barrick

6  cannot be estopped for having promised  to assume obligations that

7  did not exist.

8       Even if estoppel applies here, it is not clear what the

9  appropriate remedy would be.  Bullion argues that under the rule of

10 Pure Oil, Barrick must give back the Leeville Mines, otherwise known

11 as the Subject Property, if the AOI Provision is found to be void.

12 Bullion did not argue that Barrick should give back any properties in

13 the area of interest.  The obvious reason for the lack of such an

14 argument is that Bullion is not the party that sold properties in the

15 area of interest to Barrick or High Desert.  In fact, the 1979

16 agreement acknowledges that Old Bullion does not own, and will not

17 own, any property in the area of interest.  Any acquisition of mining

18 interests in the area of interest, therefore, came from third

19 parties, and those third parties are not requesting that Barrick

20 return those properties.

21      In analyzing Pure Oil, we considered whether the defect in the

22 AOI Provision would, at this late time, require that the entire 1979

23 agreement be declared null and void, with the ensuing result of

24 having to disentangle decades of transactions among numerous parties.

25

26      [6] Nor was this promise the sole consideration for the purchase.
    High Desert paid the Bullion-Monarch Joint Venture $9.5 million in cash
27  and a royalty on production from the Subject Property.

28

We conclude that it does not.  In Nevada, "[w]hether a contract is entire, or separable into distinct and independent contracts, is a question of the intention of the parties, to be ascertained from the language employed and the subject matter of the contract." Linebarger v. Devine et al., 214 P. 532, 534 (Nev. 1923).  In this case, the AOI Provision is distinct from the remainder of the contract, and is alone void under the rule against perpetuities.  To void the remainder of the 1979 agreement, which has not been challenged, on the basis of the rule against perpetuities, would not only create a logical inconsistency in the application of that rule, it would also create an enormous barrage of unanswered questions, none of which have been presented or argued here.  If the agreement as a whole were invalidated, the Subject Property would have to be returned, but so would the royalties under Paragraph 4 that Bullion has been collecting since 1979.  We do not believe that such an action is necessary as a result of our ruling today.  Our ruling only concerns the AOI Provision of the 1979 agreement.[7]

### B. Unjust Enrichment

Bullion's claim of unjust enrichment also fails.  Unjust enrichment is the "unjust retention . . . of money or property of another against the fundamental principles of justice or equity and good conscience."  Asphalt Products Corp. v. All Star Ready Mix,

---

[7] The AOI Provision states that Universal, the operator of the 1979 joint venture, had the exclusive right to acquire additional mineral properties within the area of interest.  Bullion argued at length that Bullion had no right, as a result of this provision, to acquire any mineral interests in the area of interest.  To the extent that this condition appears to serve as the consideration for Bullion's royalty in the area of interest, it is also void.

22

1  *Inc.*, 898 P.2d 699, 701 (Nev. 1995) (quoting *Topaz Mutual Co. v.*

2  *Marsh*, 839 P.2d 606, 613 (Nev. 1992)).  In order to find that Barrick

3  was unjustly enriched, we must find that 1) Bullion conferred a

4  benefit upon Barrick, 2) which Barrick has retained without payment.

5  *Leasepartners Corp. v. Robert L. Brooks Trust*, 942 P.2d 182, 187

6  (Nev. 1997).  Here, there is insufficient evidence that Bullion

7  conferred a benefit to Barrick without just payment.  Bullion claims

8  that it conferred benefits to Barrick in two ways.  First, Bullion

9  argues that it transferred the Subject Property to Universal, who

10 eventually transferred it to Barrick through successors.  Second,

11 Bullion argues that it relinquished its rights to acquire any mineral

12 properties within the area of interest since 1979.  The first

13 contention, that Bullion unjustly enriched Barrick by transferring

14 the Subject Property in 1979, is without merit.  The benefit was

15 conferred on Universal, not Barrick.  Nor was the transfer of the

16 Subject Property lacking in consideration.  Universal and its

17 successors have undisputedly been paying substantial royalties on

18 production from the Subject Property since 1979.  Furthermore,

19 Barrick's predecessor, High Desert, paid the Bullion-Monarch Joint

20 Venture, from which it bought the Subject Property, $9.5 million in

21 cash and a royalty in production from the land.  The void AOI

22 Provision does not appear to have been the consideration for the

23 Subject Property, which was conveyed and paid for in various ways

24 relating to the Subject Property, such as through the royalty

25 provision of Paragraph 4, and therefore, Bullion, or its predecessor,

26 did not confer an unpaid-for benefit on Barrick in transferring the

27 Subject Property to Universal.  Furthermore, because our ruling does

28

not invalidate the entire 1979 agreement, unjust enrichment cannot apply to the Subject Property because there is an express written agreement governing the Subject Property.  See, e.g., Leasepartners, 942 P.2d at 187.

The second contention, however, warrants consideration.  The AOI Provision provides that Universal, as operator, had the exclusive right to acquire additional mineral properties within the area of interest on behalf of the parties to the 1979 agreement, and that all other parties were to immediately assign to Universal any properties they held in the area of interest.  Because we rule today that the AOI Provision, in its entirety, was void at execution, Bullion is not barred from obtaining mineral properties in the area of interest.  We do not find, however, that this provision in some way created a benefit by which Barrick was unjustly enriched. Neither Bullion nor Old Bullion held any property in the area of interest at the time of the 1979 agreement.  (May 2010 Dep. of R. D. Morris at 133 (#69-1).) Nor could Bullion provide any evidence of any occasion on which it considered or rejected any proposal to acquire mineral properties in the area of interest.  (Oct. 2009 Dep. of R. D. Morris at 74-75 (#88-4).)  There is, in short, no evidence of any benefit conferred upon Barrick, and certainly no benefits that Barrick had an opportunity to accept or reject.  See Siskron v. Temel-Peck Enterprises, Inc., 216 S.E.2d 441, 444 (N.C. Ct. App. 1975) (unjust enrichment does not

apply when defendant had no suitable opportunity to accept or decline the benefits allegedly conferred).[8]

### C. Covenant of Good Faith and Fair Dealing

Every contract contains an implied covenant of good faith and fair dealing. <u>Ins. Co. of the West v. Gibson Tile Co., Inc.</u>, 134 P.3d 698, 702 (Nev. 2006). Each party to a contract "impliedly agrees not to do anything to destroy or injure the right of the other to receive the benefits of the contract." <u>Hilton Hotels Corp. v. Butch Lewis Productions, Inc.</u>, 808 P.2d 919, 923 (Nev. 1991). If "one party performs a contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, damages may be awarded against the party who does not act in good faith. <u>Id.</u> The mere act of seeking a determination of whether the AOI Provision in the 1979 agreement was void under the rule against perpetuities is not a breach of the covenant of good faith and fair dealing. It would hardly be equitable to hold Barrick liable for a provision that was void *ab initio*, and contained in an agreement to which Barrick was not a party. Barrick's only representations, which have been challenged in a separate motion for summary judgment for lack of obligation, were

---

[8] In a related case filed by Bullion against Newmont, Barrick's joint venture partner, we decided that Bullion's claims against Newmont are barred by the doctrine of laches. While we do not decide this case on the basis of laches, we do note that our reasoning in the related case that Bullion slept on its rights for over a decade is relevant here. While we do not require that laches bar the unjust enrichment claim, we do find it troubling that Bullion brought suit against Barrick for many years of unpaid royalties, claiming that it conferred a benefit by abstaining from acquiring any properties in the area of interest, but without any proferred evidence of any opportunities Bullion had to forego during the decade of time in which it delayed bringing any claims.

that Barrick would assume the obligations of the Bullion-Monarch Joint Venture.  The Bullion-Monarch Joint Venture is not a party to this suit, and Barrick can hardly have breached a covenant of good faith and fair dealing in refusing to undertake obligations the Bullion-Monarch Joint Venture itself did not have.

On the basis of the foregoing, we conclude that estoppel, unjust enrichment, and the covenant of good faith and fair dealing are not bases on which to hold that Barrick must pay royalties on production from the area of interest.

## V. Remaining Pending Motions

In light of our conclusion that Bullion's claims are barred by the rule against perpetuities, Bullion's motion for partial summary judgment (#53) regarding Barrick's liability will be denied. Further, we need not reach the merits of Barrick's other pending motion (#50), which will be denied as moot.[9]

## VI. Conclusion

Under the common law rule against perpetuities, interests must be certain to vest or fail within the perpetuities period, or the interest is void *ab initio*.  Because the agreement here was between corporations, and there was no measuring life specified in the agreement, the perpetuities period is twenty-one years, far shorter than the purported ninety-nine year term of the 1979 agreement.

_____

[9] Bullion's claim for an accounting is likewise without merit and moot in light of our ruling that the rule against perpetuities bars Bullion from seeking royalties under the AOI Provision.

Bullion's claims to royalty payments on property acquired at any time during the ninety-nine years are, therefore, invalid, and must be dismissed.  Estoppel, unjust enrichment, and the covenant of good faith and fair dealing do not require otherwise.

**IT IS, THEREFORE, HEREBY ORDERED** that Barrick's "Motion for Summary Judgment on All Claims Pursuant to the Rule Against Perpetuities" (#43) is **GRANTED**.

**IT IS FURTHER ORDERED** that Barrick's "Motion for Summary Judgment Regarding Lack of Obligation to Plaintiff" (#50) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Bullion's motion for partial summary judgment (#53) is **DENIED**.

The Clerk shall enter judgment accordingly.

DATED: February 7, 2011

_Edward C. Reed._
_____
UNITED STATES DISTRICT JUDGE